MONROE, C. J.
The decedent died April 13, 1912, leaving an estate valued, as per inventory at $5,853.94 and his nephew Ovide Le Besque having been appointed administrator, reduced the assets to cash and filed a provisional account, which was opposed by .uouis A. Dupont, decedent’s stepson, who prosecutes this appeal from the judgment thereon. The administrator has filed an answer praying that the judgment be amended in a single particular; but since the case was submitted the parties have entered into an agreement and compromise which reads in part as follows:
“That it has been agreed and compromised by and between your petitioners (the sole persons having any interest therein) that, in so far as the following items of the account of Ovide Le Besque, the correctness of which is now before the court on appeal, are co*</-med, the said account be amended and correcitvi as follows:
“(1) The item of asset of $46.56 be increased to the sum of $l5l.94.
“(2) The attorney’s fees of $350 be reduced to the sum of $300.
“(3) The administrator’s commission of $146.-36 be reduced to the sum of $101.34.
“(4) The claim of Miss Alice Guérin, for $610.80, be reduced to the sum of $560.SS, and that she be recognized as a privileged creditor for that amount.
“And that the judgment appealed from be accordingly amended.
“Petitioners further represent that, in consequence of the foregoing agreement, the sole items before this honorable court for determination are those of your first-named petitioner, Louis A. Dupont, wherein he prays to be recognized as the bona fide holder and owner of the decedent’s note for the sum of $1,400, dated May 16, 1910 [should be May 18], bearing interest at the rate of 7 per cent, per annum from date until paid, which note, he avers, is secured by vendor’s privilege and special mortgage on the one piece of real estate belonging to this succession, and to the proceeds of sale of which it was transferred by order of court; and, secondly, the claim of the said opponent, Louis A. Dupont, to be recognized as the bona fide holder and owner of decedent’s note of hand for the sum of $712, dated April 12, 1911, with interest thereon at the rate of 8 per cent, per annum from date until paid.”
Proceeding, then to consider the two claims thus referred to, we find that on May 18, 1910, decedent bought a piece of property on Dupré street for $1,800, of which, according to the recitals of the act, executed before Dejan, notary, he paid $400 in cash, and for the balance gave the note for $1,400, secured by mortgage and vendor’s lien. As an undisputed fact he paid the entire purchase price in cash and kept the note in his own possession.
Mrs. J. P. Carrere' testifies that she bought the note from the decedent on or about May IS, 1911 (the date when it was paid by decedent, with accrued interest), and her two granddaughters also testify to the same effect. In so far as the payment of the note is concerned, the testimony so given is support *1090 ed by the decedent’s paid and canceled check of May 18, 1911, to the order of Mrs. Carrere and indorsed for her by one of her granddaughters, she being an old lady who can neither read nor write, and whose indorsement of checks was usually made in that way. Beyond that the check was filled out and signed for the decedent by L. A. Dupont, the opponent (who held the power of attorney of the decedent at that time and afterwards as the decedent began to lose his sight in 1910, or perhaps earlier, and in 1911 was nearly, if not quite, blind), and is for $1,498, being the exact amount called for by the note, with interest to maturity.
The opponent was asked whether the check was in his handwriting, and he answered, “No ; that ain’t my handwriting; no.” His counsel then said to him, “Don’t make any mistake;” and he at once said, “Yes, sir; yes, sir; that is my handwriting.” He testified that Mrs. Carrere had called on him some time prior to the issuance of the check in question and had asserted that Le Besque owed her $3,000, and yet he subsequently testified that, when Le Besque requested him to draw the check, he did not know why it should be drawn or whether the payee was a man or a woman.
On the other hand, the testimony as to the time and circumstances under which Mrs. Carrere acquired the mortgage note leaves a good deal to be desired.
A part of Le Besque’s business, it appears, was the care of real estate and the collection of rents, and he is said also to have invested money for his clients. He kept an account in bank to the credit of which he seems to have deposited whatever sums, large or small, came into his hands, but his deposit book shows no deposit of $1,400 at or about, the date (say, May 18, 1911) upon which it is said that Mrs. Carrere paid him that amount for the note.
As against the testimony of the Carreres to the effect that the note was acquired in May, 1910, and kept in Mrs. Carrere’s safety vault until its payment on May 18, 1911, Dupont testifies that he bought it from Le Besque on May 16, 1911, and his canceled cheek for $1,400, dated May 16th, and deposited to the credit of Le Besque’s account on May 17th, is filed in evidence. There is, however, something peculiar about the check, to wit, it is drawn for $1,400, whereas the note called for $1,400, with interest at 7 per cent, per annum from May 18, 1910, and it is not pretended that there was any discount. To the contrary, there appears on the back of the note an indorsement, placed there by Dupont, reading, “Interest paid to May 18, 1911, and renewed from May 18, 1911, to May 18, 1912, one year,” concerning which Dupont gives the following testimony on cross-examination:
“Q. I notice on the $1,400 mortgage note, also written on, the back of it; ‘Interest paid to May 18, 1911, and renewed from May, 1911, to May, 1912, one year.’ A. Of course, I couldn’t charge him interest when he didn’t owe it to me. Q. Was that all your handwriting? A. Yes, sir; that is my handwriting; yes, sir. Q. Did you receive the interest on this note? A. No; it was not due; I bought it on the 15th of May. I couldn’t go to work and ask him any interest. * * * Q. And you wrote on the back of the note, ‘Interest paid to May 18;’ why did you do that if you didn’t receive any interest and the note wasn’t in your possession? A. The note was in my possession. Q. Why did you say interest paid to May 18, 1911? A. To protect the old man. Somebody else could have claimed the two years’ interest. It was only a question of honesty. The man was a blind man. He didn’t owe it to me, because I bought the note on the 16th of May, 1911.”
The evidence does not show when the indorsement was written on the note or why the note was not bought at its face value, including the accrued interest, less such discount as may have been agreed on.
It does show, however, that Dupont’s check for $1,400 was deposited to the credit of Le Besque’s account on May 17th, and that, if the account had not been thus increased, there would not have been enough money *1092 there to pay the check for $1,498 which Le Besque gave to- Mrs. Carrere on May 18th, and which was paid on May 19th.
Further, as tending to show that Mrs. Carrere had not held the mortgage note for a year prior to May 18,1911, Déjan, the notary, testified that at some time prior to its maturity Le Besque offered to sell it to him, but he was unable to fix or approximate the time, as may be seen from the following excerpt from his testimony, to wit:
“Q. Mr. Dupont [should be Déjan], you were the notary who passed this act of sale by Mrs. Letehier to A. B. Le Besque? A. Yes, sir. * * * Q. According to that act, there was a note of $1,400 furnished by Mr. A. B. Le Besque, was there? A. Yes, sir. Q. To whom did you deliver that note? A. Mr. Le Besque. Q. Did you ever have occasion to see that note at any time afterwards? A. Yes, sir. Q. When did you see that note and under what circumstances? A. Before maturity. Q. Can you state how long before? A. Well,' I couldn’t exactly state; no. Q. Well, about? A. Well, it was, Judge, before the maturity. Q. A week or so? A. Oh, no; before that. Q. A month? A. Before that, I suppose. Q. Now, under what circumstances did you see that note? * * * A. Mr. Le Besque came to me and told me that he wanted to see the note. * * * Q. You recognized the note that you had paraphed yourself? A. Sure enough. Q. Did you buy the note? A. No, sir. Q. Why did you not buy it? A. Because I wanted him to give the policy of insurance and a copy of the act. Q. And he declined? A. No, sir; he said he couldn’t do it, because he has got to go to the bank to get it, and then I told the client, if he wouldn’t give the policy to us and a copy of the act, we wouldn’t take the note.”
L. E. Rabouin, “the client” to whom the notary refers, testified that he believed that Déjan spoke to him about the note “around the holidays, around, some time about, February, 1911.”
Neither Déjan nor Rabouin appears to have any interest in the outcome of this controversy, and it is impossible that Déjan could have been mistaken about the note, since it was he who prepared and paraphed it, and he says that, when Le Besque subsequently offered it to him, he took it in his hands. We conclude that Mrs. Carrere did not acquire the note in May, 1910, and did not have it in her possession from that time until May 18, 1911. The question then is: “When and under what circumstances did she acquire it?
It appears that Mrs. Carrere had loaned Le Besque $3,000, for which she had taken a note which she believed was secured by mortgage, but which she afterwards ascertained was wholly unsecured. She testifies concerning it as follows:
“Q. You were under the impression that that $3,000 note was a mortgage note? A. I was sure that the $3,000 note was a mortgage note. Q. What made you think so? A. I took the note from my bank box, and I went to the mortgage office, and there was a gentleman there, and he spoke French, and he told me that it was not a mortgage note; it was a simple note; and from there I went to Mr. Le Besque. Q. How long a time had you had the note of $3,000? A. I had that note of $3,000 and the policy of insurance of $4,000, and when it became due a year afterwards I went to the mortgage office and found out there that it was a simple note. Q. Do you remember when you got that $3,000 note? A. I had it a year before it came to maturity; I had it for one year.”
Miss Cecile Carrere, one of the granddaughters of Mrs. Carrere, testifying concerning that lady’s possession of the $1,400 mortgage note, said:
“She had it in the [bank] box, because I would go afterwards and would see every note she had, and it was always in the box.”
On the next page the testimony reads:
“Q. Did your grandmother have other notes in that bank box? A. Yes, sir; we have other notes. Q. She had other notes. A. Yes, sir; she had lots of business. Q. Can you tell me about other notes she has? * * * A. No; I couldn’t tell you, because I never did look into all the business. I only looked into that note. I knew the $1,400 was in there. Q. That is the only note you saw? A. That is the only one I saw. * * * Q. Had your grandmother any other note of Mr. Le Besque? * * * A. Yes, sir; she has another note. * * * Q. What is the amount of that note? A. I don’t know. * * * Q. You don’t know the date of it? A. No, sir; don’t know anything about it. * * * Q. You don’t know where she kept the other note of Mr. Le Besque? A. No, sir; I don’t know anything about the other note.”
Miss Irene Bon Carrere, the other granddaughter who assisted Mrs. Carrere in the *1094 management of her affairs, gave the following with other testimony:
“Q. Now, what reason did your grandmother give Mr. Le Besque that she insisted on that note [the $1,400 note] being paid on the day it fell due? A. The reason why was that he had borrowed $3,000, and she thought it was too much money out with Mr. Le Besque, and he handed us a note for $3,000; so she said, ‘I would like to have the $1,400 note paid,’ and he said, ‘Very well.’ ”
She said that her grandmother had called on Mr. Le Besque some days before the maturity of the $1,400 note, and had—
“told him that he had a note supposed to be due on such and such a day, and we would like it to be paid, and she talked about lending him $3,000 more, and it was too much, and she would like to be paid her $1,100. He said, ‘Very well.’ ”
Mrs. Oarrere has been placed on the account as an ordinary creditor upon a demand note for $3,000, dated December 3, 1910, and bearing interest at 7 per cent, from date; and it is fairly inferable from her testimony that she acquired the note about the date of its issuance. The witness must therefore have been mistaken in saying that in May, 1911, her grandmother talked about lending Le Besque $3,000 “more.”
Our conclusion is that Mrs. Carrere had already loaned the $3,000, and our rather strong impression is that she had already learned that the loan was unsecured, and had obtained from Le Besque the note of $1,400 as partial security. However that may be, we are of opinion that the evidence authorizes the conclusion that the $1,400 note was in her hands on May 18, 1911, and was paid by Le Besque on that day; the $1,400 received from Dupont having contributed to that payment. It may be that Dupont, in advancing the $1,400, expected to get the note, but he failed to satisfy the judge a quo that he got it when he drew his cheek, and we are satisfied that, when he did get it, the mortgage had been extinguished. O. C. 2217, 3411; Hibernia Bank v. Succession of Gragard, 109 La. 677, 33 South. 728; Pertuit v. Damare, 50 La. Ann. 905, 906, 24 South. 681; Pons v. Yazoo & M. V. R. Co., 122 La. 171, 172, 47 South. 449.
We are further of opinion, however, that he is entitled to recover, as an ordinary creditor, the amount advanced by him, with interest as called for by the note, from May 18, 1911, since he himself has taken the view that he was not entitled to interest prior to that date.
2. We find no suggestion anywhere that Mr. Le Besque was incapable, save for the defect in his sight, of administering his affairs on April 12, 1911, when the note for $712 was made. The Carreres testify that he came to their home more than a month later, and paid and took up the $1,400 note. Nor was there any attempt to contradict opponent’s testimony concerning the origin of the debt represented by that note, although one of the opposing counsel, whose name he mentions, was in a position to know whether it was true.
' That testimony reads as follows:
“I went down to the bank and made a cash deposit for him [Le Besque] that morning, because the money was needed. Mr. Rossi had written that Mr. Richard would proceed against him that very day; so, to avoid a lawsuit, I went to Mr. Rossi’s office,'and he wasn’t there, so I went down to Mr. Richard,” etc.
We therefore conclude that opponent is also entitled to recover, as an ordinary creditor, on the note for $712, with interest as called for.
It is accordingly ordered that the judgment appealed from be amended in the following particulars, to wit: In so far as it rejects in toto the claims of Louis A. Dupont upon the notes for $1,400, and $712, hereinabove described, with respect to which it is adjudged and decreed that said Dupont be recognized as an ordinary creditor of the succession, with interest on the note for $1,400, as called for, May 18, 1911, and with interest as called for by the note of.$712, with respect to the *1096 item of $46.56 with which the administrator charges himself and which he is directed to increase to $151.94, with respect to the item of $350 allowed as attorney’s fees, which is ordered to be reduced to $300, with respect to the item of $146.36, charged as commission, which is reduced to $101.34 and with respect to the claim of Miss Alice Guérin for $610.80, which is reduced to $560.88, and, as so reduced, recognized as a privileged claim.
It is further decreed that, as thus amended, said judgment be affirmed, and said account homologated; the costs in both courts to be paid by the mass.